## Commonwealth v. Crass.

(Decided May 31, 1918.)

### Appeal from Graves Circuit Court.

1.   Gaming—Tricks—Enabling Statutes.—The law is generally elastic enough to defeat tricks without enabling statutes for that purpose.

2.   Criminal Law—Act Made Up of Series of Events.—Where an act is made up of a series of events and is criminal in its result, all the occurrences leading up to the consequence need not be done, even within the jurisdiction where it is sought to be permitted; it is enough if the result of that negotiation constitutes an offense.

3.   Gaming—Betting on Election—Where Offense Committed.—Where the parties really made a bet on an election while they were in Kentucky and went to a town in Tennessee where they put up the money in a Tennessee bank and returned to Kentucky, the

bet was made in Kentucky and the parties may be punished under section 1975 of the Kentucky Statutes for betting on an election in this state.

CHARLES H. MORRIS, Attorney General, and D. M. HOWERTON, Assistant Attorney General, for appellant.

J. E. WARREN for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

The appellee, Will Crass, was indicted by the grand jury of Graves county for betting on an election. Graves county extends southwardly to the Tennessee state line, and Dukedom is situated in Tennessee immediately south of and next to the Graves county line.

The defense is that the bet was not made in Kentucky but was made at Dukedom, in Tennessee. Upon a trial of the case by the circuit judge without the intervention of a jury, Crass was acquitted. The Commonwealth appeals.

The Commonwealth introduced but one witness— W. J. Simpson—the man with whom Crass made the bet. The defendant offered no proof. Simpson testified that he and Crass met in Mayfield and from there went together in an automobile to Dukedom, a distance of about ten miles; that he made three bets with Crass aggregating $500.00; that the bets were made in Dukedom, Tennessee; that they first agreed on making the bets while in the Dukedom bank, and that nothing was said in Mayfield about making a bet. For the purpose of being more specific, we quote from Simpson's testimony as follows:

"Q. How much did you bet when you got there (meaning Dukedom)? A. $100.00. Q. Did you agree on that before you left here? A. No, sir. Q. Well, what did you go over there for? A. I don't know. Q. What did the defendant go with you over there for? A. I could not tell. Q. How many times did you and defendant go over to Dukedon to make bets? A. Twice. Q. You went twice, and you made three different bets? A. Yes, sir. Q. How much money did you carry with you the first time? A. I don't remember. Q. How much the second time? A. I don't remember. Q. How much did you have up over there in all with the defendant on that election? A. It was either $500.00 or $550.00. Q. Did you put the money up in cash, or by check? A. Put it up in the bank.

Q. When did you get the money out of the bank here? A. I don't know that I got it out of the bank here; I usually have money at home. Q. Did you win that money, or did you win the bets? A. Yes, sir. Q. Who paid you? A. The Dukedom bank. Q. Where were you when you received the money? A. I went to Dukedom and got it. Q. After the election? A. Yes, sir. Q. Where does the defendant live? A. I could not tell you. Q. You don't know where Will Crass lives. A. No, sir. Q. Where did he live at the time you made the bet? A. I don't know. Q. Now didn't he live here in this county at that time? A. I didn't know him the first time I met him. Q. Well who introduced you to him? A. Nobody. Q. How did you get together; you said you didn't know him: did you go to his place? A. No, sir. Q. Where did you meet? A. About half way between here and the store; he came to me. Q. What did he say when he came to you? A. He says 'I am ready to go to Dukedom, Tennessee.' Q. For what purpose? A. I could not tell you. Q. Did you ask him what for? A. No, sir. Q. Did you go to Dukedom with him not knowing what you were going for? A. Yes, sir. Q. You had no idea what you were going over there for? A. No, sir."

The defendant would have us believe either that he and Simpson traveled from Mayfield to Dukedom, and returned, a distance of twenty miles, or more, on two separate occasions, not knowing what they were going for, or that in the language of the sporting fraternity of Mayfield, when one citizen says to another, "I am ready to go to Dukedom, Tennessee," he really means they have already made a bet in Mayfield and would go through the farce of riding down to Dukedom and back for the purpose of evading the statute. The last is most probably true; but the courts will not permit the laws to be thus evaded. People are to be judged by what they do, and from the usual and ordinary results of their acts, rather than from their words, whenever they are contradictory.

The statute provides that, "if any person shall wager or bet any sum of money or anything of value upon an election . . . he shall be fined one hundred dollars, to be recovered in any county where the party so offending may be found, or where the bet is made." Ky. Sts.,

sec. 1975. The object of the statute is to protect the purity of the elective franchise, and to secure perfect freedom and impartiality in the exercise of this inestimable right; and such construction should be given the statute that will accomplish the object intended. Commonwealth v. Kirk, 4 B. Monroe 1.

We are of the opinion that the bet in this case was made in Graves county, and that the parties traveled to Dukedom merely for the purpose of evading the statute. No other conclusion can be drawn from Simpson's testimony.

Many similar attempts to evade prosecution under the local option laws of this state are to be found in the books. It is true section 2570, of the Kentucky Statutes, expressly provides that "no trick, subterfuge or device shall be allowed to evade the purpose of the local option law." But this court has held that this enabling statute is not necessary to enable the courts to go behind any device, trick or subterfuge to sustain a conviction of a person who was really guilty.

It was so held in Commonwealth v. Adair, 121 Ky. 689, where this court said: "Indeed, section 2570, *supra,* was not needed to enable the courts to go behind subterfuges and evasions in such matters. The law is generally elastic enough to defeat tricks, without enabling statutes for the purpose. Where an act is made up of a series of events, and is criminal in its result, all the occurrences leading up to the consequence need not be done, even within the jurisdiction where it is sought to be punished. It is enough if the result of that negotiation constitutes an offense."

So, it will be seen that section 2570 of the statutes really gives no additional power to the courts in this respect: they may go behind tricks, subterfuges and devices in the enforcement of liquor laws and betting laws alike. In the Adair case, *supra,* Adair conducted a brewery outside the corporate limits of Mayfield. The city was "dry" territory; the county outside the city was "wet." The prosecuting witness ordered from Adair, by telephone, a case of beer to be delivered in the city. The driver, who was authorized to accept the price of the beer, refused to accept it in the city, but went with the purchaser over the line of the city limits where the payment was made. This court held that Adair was guilty of selling liquor in the city of Mayfield.

In Lemore v. Commonwealth, 127 Ky. 480, the defendant was operating a gasoline boat on the Mississippi river. The prosecuting witness, to whom the liquor was sold, boarded Lemore's boat on the Kentucky side and after it had gone over to the Missouri side of the river, he informed Lemore that he desired to buy a quart of whiskey, and the sale was made. The boat returned to the Kentucky side and landed a short distance from where it started. In that case, as in this, not a word was spoken in Kentucky, where the sale was charged to have been made; but the circuit court found Lemore guilty, and the judgment of conviction was affirmed by this court. In that opinion the court said: "But when he took the proposed purchaser out beyond the thread of the stream to sell him whiskey, and then brought him back to the Kentucky shore, the whole transaction will be looked at, and the sale will be regarded as made not at the point at which the whiskey was delivered and the money paid, but on the Kentucky shore, where it was begun, and where it was consummated." See also Merritt v. Commonwealth, 122 Ky. 669.

Brand v. Commonwealth, 110 Ky. 980, was a prosecution under the gambling statute in the Graves circuit court, wherein the defendant contended that the bet was not made in Kentucky, but was made in Tennessee—the case being somewhat similar in its facts to the case at bar. But in overruling defendant's contention the court said: "It is very earnestly insisted for appellant that the bet was not made in the state of Kentucky, or Graves county. The evidence conduces to show that the bet was in fact made in Graves county, and that Brand placed his money in the hands of Ben Hunt, and Matthews placed his in the hands of Frank Gillman, and they put the money in the hands of one McGuire to send to Jim Si. Cavender to hold. Cavender, it seems, did business in Tennessee, and lived in Graves county, Kentucky. The evidence also tends to show that this arrangement was made for the express purpose of avoiding the Kentucky statute in regard to betting."

In our opinion these decisions are not only sound in their interpretation of the law, but are conclusive of the case at bar. If the statute can be evaded by so simple a device as that here attempted it means nothing; and bet-

ting can easily be conducted and without any danger of prosecution in all of the forty-eight border counties of Kentucky by merely going across the line into Ohio, Indiana, Illinois, Missouri, Tennessee or West Virginia, and there putting up the money pursuant to an agreement which had already been made in Kentucky. The courts will not countenance such an evasion of the law.

Judgment reversed for a new trial.